J-A04026-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.Y.R. A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.R., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1399 MDA 2022 |

Appeal from the Decree Entered September 20, 2022
In the Court of Common Pleas of Berks County Orphans' Court at No(s): 87987

BEFORE:  STABILE, J., DUBOW, J., and McCAFFERY, J.

MEMORANDUM BY DUBOW, J.:                    **FILED FEBRUARY 15, 2023**

D.R. ("Father") appeals from the September 20, 2022 Decree that involuntarily terminated his parental rights to then-nine-year old Z.Y.R. ("Child").  Upon careful review, we affirm.

Z.P. ("Mother") and Father (collectively, "Parents") are parents to Child, who was born in September 2012 when Parents were attending high school. Parents never lived together and ended their romantic relationship shortly after they graduated.  A 2014 custody order granted Father physical custody of Child every other weekend and every Wednesday night, however Father rarely exercised that time with Child.  In 2014, Father had one overnight visit with Child and saw Child approximately ten times per year from 2015 until 2020.  Father has not visited with Child since December 2020.

Mother met her current husband, K.V. ("Stepfather"), in high school but the two were reintroduced in July 2019.  The two married in June 2021 and

have two biological children together, Z.V. and Z.V., born in September of 2020 and March of 2022, respectively. Stepfather coaches Child in basketball and baseball.

Father is not married. He has two younger children, who he sees regularly due to having amicable relationships with their respective mothers.

On December 2, 2021, Mother filed a petition for the involuntary termination of Father's parental rights to Child pursuant to 23 Pa.C.S. §2511(a)(1). Specifically, Mother averred that Father's conduct over the past six months evidenced a settled purpose of relinquishing his parental claim to Child because he had not visited with Child since December 12, 2020.

The trial court appointed counsel for both Father and Child, and also appointed a guardian *ad litem* ("GAL") for Child. The court held a hearing on Mother's petition on September 7, 2022. The court heard testimony from Mother, Father, GAL, and Child.

The trial court provided a thorough and accurate summary of testimony in its Opinion, which we adopt for purposes of this appeal. **See** Trial Ct. Op., filed 11/3/22, at 10. In sum, Mother testified that, despite the custody order permitting more contact, Father only had Child visit overnight on one weekend in 2014 and has not seen Child more than ten times per year from 2014 to 2020. Mother explained that Father attended approximately half of Child's baseball games in 2019 or 2018 but has not attended games since then. Mother acknowledged that Father called and asked to see Child a few times and, because Child was uncomfortable with an in-person visit, in July 2021

- 2 -

Mother offered Father contact with Child through FaceTime but Father refused. Mother testified that Father has failed to consistently pay child support and refuses to send payments until he receives a contempt notice in the mail. Mother further testified that the only items that Father has bought for Child in nine years were a baseball helmet, a basketball hoop, a video game console, and some sneakers as birthday or Christmas gifts. Mother stated that the only school event that Father attended was Child's first day of preschool six years ago. Mother testified that, at one point, Father moved to California but did not inform her until after he moved. Mother further testified that she does not know how long Father lived in California, because he did not contact her or Child when he returned to Pennsylvania.

Mother testified that she had not considered a termination of Father's parental rights until Father sent her a text message indicating that he would voluntarily relinquish his parental rights if he did not have to pay child support anymore. Mother explained that once Father suggested this, she had a family meeting with Child to ascertain Child's position. Child did not think his life was going to change because Father was already not involved. Mother believes a termination of parental rights is in Child's best interest because Father has never taken any responsibility for raising Child and it is too late to take responsibility now. Mother also stated that Child wants to be adopted by Stepfather.

Father testified that he went to California in the summer of 2015 to try to attend college and did not tell Mother because he was not sure it would

work out and did not want the Custody Order to be affected. Father explained that he returned briefly in September for Child's birthday, returned permanently in November, and saw Child at Christmas. Father testified that after he returned from California, he thought the Custody Order had expired so he saw Child on Mother's terms. Father testified that he saw Child a few times a month from 2015 to 2017 and stopped seeing Child on Wednesdays when Child started school in 2017. Father testified that from 2017 until 2020 he was seeing Child approximately twice a month. Father informed the court that he attended all of Child's baseball games and most of his practices because Mother could not stop him.

Father explained that the last time he visited with Child was in December 2020 at a birthday party for one of his younger children. Father found out that from a third party that after the party Child "supposedly [] got sick and somehow it's my fault. And ever since then it's been downhill." N.T. TPR Hearing, 9/7/22, at 152. Father testified that he attempted to reach out multiple times to see Child but Mother would not respond or Mother would inform him that Child did not want to see him. Father explained that he bought Christmas presents for Child in 2020 but did not give them to Child due to his own pride; he wanted to see Child in person rather than drop off the gifts. Father testified that the gifts are still in his garage.

Father explained that he briefly saw Child in June 2022 when Child and Mother attended a funeral for Father's grandmother. Father testified that he asked to see Child the next day and Mother did not respond. Father also

testified that a week later he asked if Child could attend a major league baseball game with him in New York for the weekend and Mother responded that Child would like to come but was not comfortable attending without Mother and Stepfather there. Father confirmed that when he offered to take Child to the baseball game, he had child support arrearages close to $3,000 but stated, "I mean, do you think my son would rather an experience or do you think my son would rather [have] money." *Id.* at 173.

Father testified that he always tried to keep up with Child support payments, and if Mother had asked him for additional money, he would have been willing to give it to her. Father admitted sending a text message to Mother telling her that he would relinquish his parental rights to Child but explained that the message was sent in anger, and he did not actually feel that way. Father testified that he does not want to relinquish his parental rights to Child, he loves Child, and he wants to see Child on a consistent basis. Father explained that he thinks Stepfather is a good influence in Child's life and he believes that it is in Child's best interest to have both Father and Stepfather involved in Child's life.

Child testified that he does not remember Father attending his baseball games or spending alternate Saturdays with Father. Child remembers Father picking him up once every two or three months. Child does not want Father to start to come to his baseball games again because he does not have a relationship with him. In reference to his relationship with Father, Child explained, "it never really ended because I never had a relationship with him."

*Id.* at 218.  Child remembers Father picking him up once every two or three months for a visit, and Child wanted to see his Father more than that.  Child testified that when he was around seven or eight, he did not want to visit with Father anymore because he "didn't feel comfortable around him" and "didn't really know him that much."  *Id.* at 220.  Child testified that he wants Stepfather to be his dad because "he takes care of me and he loves me."  *Id.* at 221.  Child explained that Stepfather cooks for him, coaches his baseball team, and helps him with homework.

When Father's attorney asked Child what Father could do better, Child responded that maybe Father could do more things with him.  However, Child explained that if he visited with Father, he would want someone else to be there with him.

Finally, the GAL testified, and submitted a report into evidence.  The GAL testified that although Father is lax with seeing Child, providing sufficient support for Child, and maintaining communication with Child, she does not believe that termination of Father's parental rights is warranted at this time.  The GAL testified that she views Father as a passive individual who does not like to make waves, rather than an individual who has failed to perform parental duties.  The GAL stated that Mother did not fulfill her burden to prove by clear and convincing evidence that Father's rights should be terminated pursuant to 23 Pa.C.S. 2511(a)(1) and that it was her belief that termination was not in Child's best interest.  The GAL stated that she did not recommend a termination of Father's parental rights at this time.

On September 9, 2022, the trial court involuntarily terminated Father's parental rights to Child.

Father timely appealed. Father and the trial court both complied with Pa.R.A.P. 1925.

Father raises the following issues for our review:

A. Whether the trial court erred and/or abused its discretion by terminating Father's parental rights in that the court failed to properly weigh the substantial, sufficient[,] and credible evidence which established petitioners' failure to meet their burden of proof with clear and convincing evidence?

B. Whether the trial court erred and/or abused its discretion by terminating the rights of Father where the evidence failed to establish by clear and convincing evidence that termination would be in the best interest of [] Child?

Father's Br. at 4 (some capitalization omitted).

**A.**

In addressing Father's issues, we are mindful of our well settled standard of review. When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for

the trial court's decision, the decree must stand." ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. "Initially, the focus is on the conduct of the parent." ***In re Adoption of A.C.***, 162 A.3d 1123, 1128 (Pa. Super. 2017) (citation omitted). "The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." ***Id.*** (citation omitted). "If the court determines that the parent's conduct warrants termination of his or her parental rights," the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." ***Id.*** (citation omitted).

**B.**

Father first avers that the trial court abused its discretion when it involuntarily terminated his parental rights pursuant to Section 2511(a)(1). Father's Br. at 13. Father argues that the trial court failed to consider evidence that he attempted to contact Child in the six months preceding the filing of the petition, namely once in June of 2022. ***Id.*** at 15. Father also argues that Mother deliberately created obstacles to impede Father's relationship with Child, including alienating Child from Father by revealing inappropriate text messages to Child and failing to provide Father with Child's sporting schedules. ***Id.***

Section 2511(a)(1) provides that the trial court may terminate parental rights if the petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties."  23 Pa.C.S. § 2511(a)(1).  The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of parental rights.  **In re B.L.L.**, 787 A.2d 1007, 1013 (Pa. Super. 2001).  Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision.  **In re K.Z.S.**, 946 A.2d 753, 758 (Pa. Super. 2008).  Additionally, "[t]he court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination."  **Id.** (citations omitted).  Notably, "[w]ith respect to any petition filed pursuant to subsection (a)(1) . . . the court shall not consider any efforts of the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."  23 Pa.C.S. § 2511(b).

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance. This affirmative duty . . . requires continuing interest in the child and a genuine effort to maintain communication and association with the child. Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations, internal quotation marks, and internal paragraph breaks omitted).

Moreover, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.* (citation omitted).

Our review of the record reveals that the trial court did not abuse its discretion when it concluded that Mother presented clear and convincing evidence to terminate Father's parental rights under Section 2511(a)(1). The trial court considered the totality of the circumstances and concluded that Father had refused or failed to perform parental duties. The court discredited Father's testimony that Mother attempted to block Father from seeing Child.

*See* Trial Ct. Op. at 10.  Further, the trial court found Mother's testimony to be credible that Father simply failed to make an effort to be a part of Child's life.  *Id.*  The court emphasized that Father failed to visit Child, maintain contact with Child, pay child support, or give Child presents on a regular basis, opining:

> Throughout Child's life, Father saw Child only sporadically and not more than ten times a year, according to Mother and Child.  The last time that Father saw Child was December 2020.  Father still has Child's Christmas presents because his "pride" prohibited him from delivering the gifts or giving them to someone else to deliver.  Even the [GAL], who did not recommend that Father's rights be terminated, believes that Father is lax with seeing Child, providing support for Child, and maintaining communication with Child.  Father can behave irresponsibly because he knows that Stepfather will parent Child in his absence.
>
> This court does not find that Mother put insurmountable obstacles to block Father's contact with Child.  Moreover, Father never sought legal action to enforce his custody order if he had found Mother to be obstreperous.  Father never agreed to calls of FaceTime with Child, who was hesitant to see him or to be alone with him.  Father's priority was not to be "disrespected," so he would not agree to anything less than a personal meeting with Child even if Child was unwilling to have visitation.

*Id.* at 13.  The trial court found "Father has had no contact with Child for over one year.  Therefore, the statutory grounds for the termination of Father's parental rights have been met."  *Id.* at 10.  The record supports the trial court's findings.  We decline to reweigh the evidence or interfere with the trial court's credibility determinations.  Accordingly, we find no abuse of discretion.

## C.

In his second issue, Father avers that Mother failed to establish by clear and convincing evidence that termination would be in Child's best interest. Father's Br. at 16. Father argues that the absence of a bonding evaluation is fatal to Mother's case. *Id.* Father further argues that there is an existing bond between Father and Child, evidenced by Child's testimony that Father could do better by seeing Child more. *Id.*

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews whether "termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted).

One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, "with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship.

- 12 -

*Id.* at 898. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Finally, when evaluating a bond between parent and child, the trial court is not required to use expert testimony and, moreover, Section 2511(b) does not require a formal bonding evaluation. *In re D.L.B.*, 166 A.3d 322, 328 (Pa. Super. 2017).

As an initial matter, Father's claim that the absence of a formal bonding evaluation precludes termination is blatantly erroneous. As stated above, the trial court is not required to use expert testimony to evaluate a bond between a parent and child. Instantly, the trial court considered testimony from Mother, Father, and Child and found that Child did not have a meaningful bond with Father. Moreover, the court found that terminating Father's parental rights would be in Child's best interest. The trial court opined:

> Father is, at most, an acquaintance to Child. Child receives love, support, and care from Stepfather. Child wants to be adopted by Stepfather and be Stepfather's son legally. Child knows who his birth Father is. As Mother suggested, perhaps when Child is an adult, the two can form some sort of relationship; however, Child needs a consistent paternal figure in his life now. Father has presented no evidence that he will change and make Child a priority. Father takes no responsibility for his lack of interaction with Child. Father's best evidence is that he went to Child's baseball games. Even then he was a spectator at an event and not engaged in parenting. Child recognizes that his true father has been Stepfather. This court simply made the parenting reality for Child a legal one.

Trial Ct. Op. at 39. The record supports the trial courts findings, and we discern no abuse of discretion. Once again, we decline to usurp the trial court's credibility determinations or reweigh the evidence.

**D.**

In conclusion, our review of the record supports the trial court's findings. We discern no error of law or abuse of discretion with respect to the trial court's conclusion that Mother presented clear and convincing evidence to terminate Father's parental rights pursuant to Section 2511(a) and (b).

Decree affirmed.

Judge Stabile joins the memorandum.

Judge McCaffery concurs in result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/15/2023